# Kelly's Appeal.

1. Horses purchased by A, B, and C, in partnership, were levied on under an execution against A for his private debt, and on an execution against B and C for the debt of B on a judgment confessed by B against himself and C; *after* the sale the judgment was on motion of C set aside as to him. *Held,* that the vacating of the judgment did not affect the validity of the previous sale under executions against all the partners, but that the proceeds of it represent the property, and the execution creditors occupy the place of the purchaser; that C can claim out of the proceeds only to the extent of the interest he had in the property; and if on the settlement of the account, under the direction of the court, in the course of the distribution of the proceeds of the sale, he appears to have been entitled to *no* interest *in the horses,* he is not entitled to any share of the proceeds of their sale.

2. The distribution of the proceeds of a sheriff's sale is, by the 86th section of the act of 16th June, 1836, to be made according *to law and equity;* and in the course of the distribution of the proceeds of the sale of property purchased in partnership, and sold on executions against the partners as individuals, for their separate debts, the court may direct an account to ascertain the respective rights of the partners to the proceeds in dispute.

In the matter of the appeal of Neil Kelly from the decree of the District Court for the city and county of *Philadelphia,* confirming the auditor's report in the cases of Lanigan *v.* McAfee, D. C., fi. fa., March term 1850, 192, and Patrick Kelly *v.* P. Earle and Neil Kelly, D. C., March term 1850, 278.

In 1848 and 1849, Neil Kelly and Peter Earle were engaged in several joint adventures to Ohio, &c., for the purchase and sale of cattle. About the summer or fall of 1849, Michael McAfee be-

came connected with them in the business. In the spring of 1850, Kelly, Earle, and McAfee returned from Ohio to Philadelphia, with 20 horses, of which Kelly had bought 14, McAfee 4, and Earle 2. Earle had 5 of Kelly's 14 horses also transferred to him, so that on arriving in Philadelphia, 9 horses were under the exclusive control of Kelly, 7 under Earle, and 4 under McAfee, each to sell and receive the money for his lot. Earle and McAfee each sold his lot of horses at Philadelphia, and received the proceeds. Kelly's 9 horses were levied on soon after their arrival in Philadelphia, by virtue of a fi. fa. issued and put into the sheriff's hands February 25, 1850, in the case of Ann Lanigan v. Michael McAfee, D. C., March term 1849, No. 104. Judgment $350.

Fi. fa. returnable first Monday in March 1850. A levy was made under it, upon all the interest of McAfee in the 9 horses in Kelly's possession.

On March 9, 1850, *after the return day of the fi. fa. in Lanigan v. McAfee, Peter Earle*, without the knowledge or consent of Neil Kelly, executed a bond and warrant of attorney to Patrick Kelly for $1107, real debt, naming himself (Earle) and Neil Kelly obligors, and signing thus,

PETER EARLE and NEIL KELLY,        [L. S.]
        by PETER EARLE,            [L. S.]

Judgment was entered on this bond and warrant against both Earle and Neil Kelly, viz. D. C., March term 1850, No. 35, and a fi. fa. issued against both, and put into the hands of the sheriff.

After the sale, delivery to the purchaser, payment of the money into court, and appointment of the auditor to distribute it, viz. in April 1850, a rule on plaintiff was granted to Neil Kelly to show cause why the judgment should not be set aside, which was afterwards, April 20, made absolute *as to Neil Kelly.*

The sheriff made returns to each fi. fa. in the cases of Lanigan v. McAfee, and Patrick Kelly v. Earle and Neil Kelly.

The return to Lanigan v. McAfee recites, that in obedience to that writ and to a fi. fa. in Patrick Kelly v. Earle and Neil Kelly, (March term 1850, 278,) I seized and took in execution, and sold 8 horses and a mare, as the property of the defendant within named, (viz. McAfee,) and the said Earle and Kelly, the proceeds whereof, less costs, amounting to the net sum of $440.65, I pay into court under both executions, &c.

The return to the fi. fa. in Patrick Kelly v. Earle and Neil Kelly, is similar to the return in Lanigan v. McAfee, excepting that it refers to the fi. fa. in the latter case, as this fi. fa. had been referred to in the former.

An auditor was appointed to distribute the fund, who reported

[Kelly's Appeal.]

that the $401.01, which after costs and charges remained for distribution, should be divided between Lanigan and Patrick Kelly; Lanigan to receive $282.89, and Patrick Kelly $118.12, and that Neil Kelly was not entitled to any of the fund.

The 86th section of the act of 16th June 1836 provides as follows:—In all cases of sale upon execution, as aforesaid, when there shall be disputes concerning the distribution of the money arising therefrom, the court from which the execution shall have issued shall have power, after reasonable notice given, either personally or by advertisement, to hear and determine the same, according to law and equity.

To this report the following exceptions were filed on the part of Neil Kelly:

1. The auditor erred in reporting that Neil Kelly could claim nothing from the fund in court.

2. In refusing to award the fund in court to Neil Kelly.

3. In reporting that the fund in court should be divided between McAfee and Earle.

4. In awarding $282.89 out of $401.01 to Ann McAfee, (Lanigan,) on her fi. fa., though against McAfee individually.

5. In awarding $118.12 to Patrick Kelly on his fi. fa., though the judgment on which it issued had been opened, and set aside as to Neil Kelly.

6. Because the distribution reported by the auditor is based on an attempt to trace and follow moneys, supposed once to have belonged to McAfee and Earle respectively, into the purchase by Neil Kelly of the 9 horses, the proceeds of which are now for distribution, although it was shown that Neil Kelly raised money himself which was applied for that purpose.

7. Because the auditor undertook to settle accounts between Kelly, Earle, and McAfee, in transactions prior to and unconnected with the purchase of the 9 horses by Neil Kelly, and the auditor based his distribution of the fund in court on said settlement.

8. In making the settlement in last (7th) exception mentioned, the auditor erred, 1st. In basing it on a statement of accounts furnished on the part of Earle alone, and Earle and McAfee, without any proof of its correctness or Neil Kelly's assent thereto. 2d. In not inquiring nor adverting at all to the state of accounts between Neil Kelly and Peter Earle in their joint transactions apart from McAfee, without which, the respective proportions of interests of Kelly and Earle in any partnership could not be correctly determined.

The report of the auditor was confirmed.

Exceptions were filed, alleging that the court erred,

1. In confirming the auditor's report.

F

2. In confirming said report, whereby the fund in court was awarded to Ann Lanigan and Peter Earle.

3. In refusing to award the fund to Neil Kelly, or to direct the auditor to do so.

The case was argued by *S. Hood*, for Neil Kelly, the appellant. *A. H. Smith* and *W. L. Hirst*, for appellees.

The opinion of the court was delivered by

BELL, J.—The facts ascertained by the auditor show very clearly the existence of a partnership between McAfee, Kelly, and Earle, in prosecuting the two enterprises which gave birth to the present litigation. The horses, when levied in Kelly's hands and at the moment of sale, were, consequently, partnership property. What then was the effect of the judicial sale, as between the members of the firm and the separate creditors of some of them?

Had the chattels been sold by virtue of an execution or executions, at the same time in the hands of the sheriff, against McAfee and Earle alone, the purchaser would have stood in their shoes in respect of the things sold, and therefore entitled to call for a settlement of the partnership accounts; the extent of his interest being determinable by the result of that account. Being subrogated by operation of law to the place of the insolvent partners, he would have represented their rights. From this it would follow that, according to the account reported by the auditor, (the correctness of which has not been assailed here,) he would have taken the value of the horses remaining after payment of the executions. But, in fact, the property was sold under executions against all the parties; for it is scarcely necessary to say, that until the judgment rendered against Kelly was set aside, the process founded upon it was valid and effective to authorize the steps taken by the officer. Under the process, then, the interest of all the defendants in the goods sold passed to the purchaser, and the right thus acquired was in no degree affected by the subsequent action of the District Court. The money paid into court must therefore be taken as representing the subject of the sale, and the execution creditors occupy what would have been the place of the purchaser under the hypothesis before stated. Now, as the destruction of the judgment entered against Kelly can work no other result than to place him in the position, in respect to the avails of the sale, he would have occupied in respect to the horses themselves, had there been no execution against him in the hands of the sheriff, it follows that, as against the separate creditors of his fellows, he can claim no greater interest in the money in court than, on a settlement of accounts, he is found entitled to claim at the hands of his partners. The application of the principle brought in view to the case before us works no injustice, for it is shown the appellant had, in truth,

no valuable interest in the horses when sold. A proper adjustment of the affairs of the partnership proves their whole worth resided in McAfee and Earle, in different proportions, and it is not to be doubted their individual creditors are entitled to the fund produced by the sale of them, in the same proportions. As the distribution was made below in accordance with the rights thus ascertained, there is no room for complaint by any of the parties.

The objection that the District Court, or its auditor, had no power to state an account between the partners, is met by the answer that by the 86th section of the act of 16th June 1836, the distribution of proceeds of sheriff's sales is to be determined according *to law and equity;* and it cannot be questioned that in a case like the present, a chancellor from necessity would direct an account to be taken.

                                             Decree affirmed.